# EXHIBIT  B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )                    CDC Number C-80683
)
HAROLD DYSON )
)
_____)

**INMATE**

**COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 24, 2006

9:26 A.M.

PANEL PRESENT:

Ms. Sandra Bryson, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Harold Dyson, Inmate
Ms. Caterra (phonetic) E. Rutledge, Attorney for
Inmate
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No        See Review of Hearing
_____    Yes       Transcript Memorandum

Kalani Allred, Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 6 |
| Pre-Commitment Factors | 6 |
| Post-Commitment Factors | 8 |
| Parole Plans | 24 |
| Closing Statements | 40 |
| Recess | 45 |
| Decision | 46 |
| Adjournment | 52 |
| Transcriber Certification | 53 |

--oOo--

1

```
 1              P R O C E E D I N G S
 2         DEPUTY COMMISSIONER BLONIEN:  We are on
 3    record.
 4         PRESIDING COMMISSIONER BRYSON:   All
 5    right.  This is a subsequent parole considering
 6    hearing for Harold Dyson, CDC Number C-80683.
 7    Today's date is 1/24/06, and the time is 09:26.
 8    We are located at California Training Facility,
 9    Soledad.  The inmate was received on February 8,
10    1984, committed from Alameda County.  The life
11    term began on February 8, 1984.  The inmate's
12    minimum eligible parole date is July 31, 1992.
13    The controlling offense for which the inmate is
14    committed is set forth in case number 77612,
15    charging in count one, violation of Penal Code
16    187, murder second, with a gun, Penal Code
17    12022.5, use of firearm.  Two years for weapon
18    to be served concurrently, for which the inmate
19    received a total term of 15 years to life.  This
20    hearing is being recorded.  For the purpose of
21    voice identification, each of us will state our
22    first and last name, spelling the last name.
23    When it is your turn sir, after you spell your
24    last name, please state your CDC number.  I will
25    start and then go to my left.  Sandra Bryson, B-
26    R-Y-S-O-N, Commissioner, Board of Parole
27    Hearings.
```

2

1          **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen

2     Blonien, B-L-O-N-I-E-N, I'm a Deputy

3     Commissioner.

4          **ATTORNEY RUTLEDGE:**  Caterra E. Rutledge,

5     R-U-T-L-E-D-G-E, Attorney for Mr. Dyson.

6          **INMATE DYSON:**  Harold Dyson, D-Y-S-O-N,

7     C-80683.

8          **PRESIDING COMMISSIONER BRYSON:**  Thank

9     you.  We have two correctional peace officers in

10    the room who are here for security purposes.

11    Commissioner Blonien, is there any confidential

12    material in the file, and if so will we be using

13    it?

14         **DEPUTY COMMISSIONER BLONIEN:**  There is

15    none.

16         **PRESIDING COMMISSIONER BRYSON:**  Thank

17    you.  All right, I'm passing Exhibit One to your

18    attorney, which is the documents we'll be using

19    today to make sure we're all on the same page.

20    Counsel, do you have those documents?

21         **ATTORNEY RUTLEDGE:**  Yes I do

22    Commissioner.

23         **PRESIDING COMMISSIONER BRYSON:**  All

24    right.  Are there any additional documents to be

25    submitted, given that you gave me some parole

26    plans documents?

27         **ATTORNEY RUTLEDGE:**  Nothing other than

3

1   what we've submitted.

2          PRESIDING COMMISSIONER BRYSON:   All

3   right.  All right sir, today you and your

4   attorney signed the document marked Exhibit Two,

5   regarding ADA Accommodation, Hearing Procedures,

6   and Inmate's Rights.  Counsel, do you have any

7   comments or concerns regarding the ADA rights or

8   the inmate's ability to participate in the

9   hearing?

10          ATTORNEY RUTLEDGE:   No.

11          PRESIDING COMMISSIONER BRYSON:   Are there

12   any preliminary objections?

13          ATTORNEY RUTLEDGE:   No.

14          PRESIDING COMMISSIONER BRYSON:   All

15   right.  Will the inmate be speaking with the

16   panel?

17          ATTORNEY RUTLEDGE:   He will be — not

18   regarding the commitment offense, but on all

19   other issues.

20          PRESIDING COMMISSIONER BRYSON:   All

21   right.  Then if you're going to speak to us

22   today sir, I need to swear you in.  Would you

23   raise your right hand please?  Do you solemnly

24   swear or affirm that the testimony you give at

25   this hearing will be the truth, the whole truth,

26   and nothing but the truth?

27          INMATE DYSON:   Yes.

4

1          PRESIDING COMMISSIONER BRYSON:   Okay,

2     thank you.  All right, I'm going to incorporate

3     by reference for the record the crime as

4     prepared and written by the Senior Deputy

5     District Attorney to the Probation Officer in

6     this case.  Sir, we've given you the opportunity

7     to discuss this case, and since you know you do

8     not have to discuss your crime.  Is there

9     anything that you would like to state to us at

10    this time regarding the crime or surrounding

11    time frame that would help us further understand

12    or make corrections or additions that you would

13    like to make for the record?

14          INMATE DYSON:  No.

15          PRESIDING COMMISSIONER BRYSON:   All

16    right.  As the prior crimes, the record shows

17    that the inmate has no prior record as a

18    juvenile, and no adult convictions or arrests

19    prior to the incident offense.

20          ATTORNEY RUTLEDGE:  Excuse me,

21    Commissioner.  I would object to the reading of

22    the letter from the District Attorney to Alameda

23    County.  We would prefer that a more accurate

24    record, that would unbiased, would be that of

25    the probation office.

26          PRESIDING COMMISSIONER BRYSON:  As I

27    understand, the probation officer's report does

5

1    not contain the details of the incident offense.

2    And therefore we will submit the summary of the

3    crime as it was obtained from the Senior Deputy

4    District Attorney's report.  So I'm going to

5    have to overrule you on that. All right sir, as

6    to your personal history, I would also like to

7    incorporate that by reference as set out in the

8    board report that has been – the board report of

9    September 2003 that has been previously written

10   into the record.  That was written by G.

11   Peabody, that's P-E-A-B-O-D-Y, Correctional

12   Counselor I, W. Stewart, S-T-E-W-A-R-T,

13   Correctional Counselor II, P. Dennis, the

14   facility captain, and Z. S. Lavorse, that's L-A-

15   V-O-R-S-E, Classification and Parole

16   Representative.  Sir, I want to give you the

17   opportunity to discuss any part of your personal

18   history that we may not have from prior reports

19   or anything that you would like to discuss with

20   us about your history prior to this offense that

21   may have bearing on it and will help us

22   understand it.

23        INMATE DYSON:  I don't know exactly what

24   it is you're – you want me to –

25        PRESIDING COMMISSIONER BRYSON:  Well sir,

26   did – I believe you did a review of your C-file

27   on October 28 or 2004?

6

1          INMATE DYSON:  Yes I did.

2          PRESIDING COMMISSIONER BRYSON:  Okay, and

3    contained in there, and actually it – all board

4    reports have been – your personal history,

5    personal factors, as we have them on record.

6    Are there any corrections you wish to make, or

7    is there anything else you wish to add to your

8    personal history which is excessive, that we may

9    not have?

10          INMATE DYSON:  Oh, no, I had a chance to

11    review the C-file, so there's nothing that we

12    need to add.

13          PRESIDING COMMISSIONER BRYSON:  All

14    right, we have read it extensively and reviewed

15    it, so I just wanted to give you an – every

16    opportunity to add anything that you felt was

17    important for us to know.

18          INMATE DYSON:  No, I had a chance to

19    review it and it was correct.

20          PRESIDING COMMISSIONER BRYSON:  All

21    right.  Thank you.  All right then, we'll move

22    along to post-conviction factors with

23    Commissioner Blonien.

24          DEPUTY COMMISSIONER BLONIEN:  Mr. Dyson,

25    this is your seventh hearing.  Your last

26    appearance before the board was March 21, 2005,

27    and there was a six-month stipulation so you

7

1    could firm up your employment plans and put on

2    the next available calendar, which brought us to

3    today.  Before that, you were denied one year on

4    December 15, 2003, and the panel recommended

5    that you remain disciplinary free which you

6    have, upgrade vocationally, participate in self-

7    help, and earn positive chronos.  Are you

8    bringing any additional chronos to me today?

9        INMATE DYSON:  Ones that I believe it may

10   not be in the files, so if you'd like to take a

11   look at these.

12       DEPUTY COMMISSIONER BLONIEN:  The

13   correctional officer will bring them to me and

14   I'll look through them.  So your current custody

15   level is Medium-A.  Your classification score is

16   19, which is the lowest possible for a lifer

17   inmate, so in order to go over what you've been

18   doing since your last parole hearing, I've read

19   through your C-file, I read your counselor's

20   report by Counselor Peabody, and it was updated

21   in 6/21/05.  I read the psych report that was

22   reviewed by Dr. Jeff Howlin, H-O-W-L-I-N, on

23   2/16/05, and referred extensively back to the

24   psych report of Dr. Joe Reed dated 9/25/03.  And

25   you received copies of all that, correct?

26       INMATE DYSON:  That's correct.

27       DEPUTY COMMISSIONER BLONIEN:  And you did

8

1    an Olson (phonetic) review?

2         INMATE DYSON:  Yes.

3         DEPUTY COMMISSIONER BLONIEN:  Which is

4    good.  So since your last hearing, let me review

5    here what you have, because you're right - your

6    C-file, I thought was missing quite a bit of

7    current -

8         INMATE DYSON:  Okay, that's why I have

9    the most recent job report.

10        DEPUTY COMMISSIONER BLONIEN:  So you work

11   as a porter?

12        INMATE DYSON:  Yes.

13        DEPUTY COMMISSIONER BLONIEN:  And you

14   have above average reports from your work

15   supervisor, the latest one dated January 5, '06.

16   What's your pay number?

17        INMATE DYSON:  It's a $20 pay number.

18        DEPUTY COMMISSIONER BLONIEN:  Okay.  And

19   on May 23, you participated in a training class

20   for those assigned, and the class covered the

21   proper use of laundry, the collection form, and

22   this chrono was issued because you

23   satisfactorily mastered the skills, and that was

24   in 5/24/2000.

25        INMATE DYSON: And on the back of that

26   paper, that's where that continues.  They're in

27   numerical order.

9

1          **DEPUTY COMMISSIONER BLONIEN:**  That on

2     March 23 you participated in service training

3     class, and you got a positive chrono for that.

4     Your work supervisor's report – you're a worker.

5          **INMATE DYSON:**  Yes.

6          **DEPUTY COMMISSIONER BLONIEN:**  And you're

7     a good worker.

8          **INMATE DYSON:**  Yes.

9          **DEPUTY COMMISSIONER BLONIEN:**  And you get

10    exceptional or above average.  And what shift

11    are you working?

12          **INMATE DYSON:**  I work in the afternoon

13    shift.

14          **DEPUTY COMMISSIONER BLONIEN:**  So tell me

15    what you do all day?

16          **INMATE DYSON:**  The job consists of

17    cleaning the building and working with officers

18    in distributing supplies, and basically that

19    covers it.

20          **DEPUTY COMMISSIONER BLONIEN:**  And then

21    what do you do in terms of self-help?

22          **INMATE DYSON:**  I'm – the last self-help

23    I believe that's there was the Anger Management

24    and the STD, Sexually Transmitted Diseases

25    Course.

26          **DEPUTY COMMISSIONER BLONIEN:**  And in the

27    Anger Management, what did you learn?

10

1        INMATE DYSON:  Well, there's a course
2   consisting of discussing in depth as to what
3   beings about those type of feelings that one
4   would get angry about in society, and through
5   the course I've learned on numerous occasions
6   what precipitated my anger factors, that caused
7   - that let me to commit this crime.  So I've
8   learned quite a bit on how to control my anger
9   and different emotional feelings.
10       DEPUTY COMMISSIONER BLONIEN:  In reading
11  over your crime, over and over again, it says
12  how much stress you were under at the time of
13  the commitment offense.  And in your
14  institutional stay, you've had the benefit of
15  some individual therapy, I know Dr. Terrini
16  (phonetic), and you've been at CMC - were you at
17  CMC?
18       INMATE DYSON:  No, Vacaville.
19       DEPUTY COMMISSIONER BLONIEN:  Vacaville -
20  you were involved in therapy there?
21       INMATE DYSON:  Yes.
22       DEPUTY COMMISSIONER BLONIEN:  And since
23  you've been in prison, the stress in the world
24  has gotten worse.  So what have you learned
25  through individual therapy, your self-help
26  groups, and maybe what you've been doing and
27  reading in your cell, that prepares you to

11

1    handle the more intensive stress that's out in

2    the world today?

3           INMATE DYSON:  Well first and foremost,

4    not to take myself as seriously as I did prior

5    to coming to prison.  And basically learning how

6    to control my thought patterns about different

7    situations involving my personal life, the job,

8    and dealing with others, such as the incident of

9    driving a car and not being angry when people

10   cut you off, and just basically learning how to

11   control your thought process.

12          DEPUTY COMMISSIONER BLONIEN:  There's, as

13   we both know, prison is a highly stressful place

14   also.

15          INMATE DYSON:  Very.

16          DEPUTY COMMISSIONER BLONIEN:  And in

17   terms of 115's you have had eight, but the last—

18   one was in 1992, and that was an administrative,

19   and of the eight you've had, two have been

20   administrative.  You've had five 128's, the last

21   one was in 1998.  So when you're out there

22   dealing with the stresses of the institution,

23   how do you handle that?  What has allowed you to

24   become disciplinary free?

25          INMATE DYSON:  Thought process.  A total

26   way of dealing - of thinking of how to deal with

27   the different processes of going through

12

1   whatever it is I'm gonna be going through.  And

2   I no longer have those stresses in my life which

3   were job-related, and some brought on by my own

4   personal way of thinking at the time.  I no

5   longer have that thought process of thinking

6   that I can take everything on myself.  And

7   having dealt with the stresses of being

8   incarcerated this number of years, I definitely

9   learned how to just let things go.

10       DEPUTY COMMISSIONER BLONIEN:  And since

11  your incarceration, what vocational certificates

12  have you accomplished?

13       INMATE DYSON:  I believe you have them

14  right there in your hand.

15       DEPUTY COMMISSIONER BLONIEN:  Well tell

16  me.  Help me.

17       INMATE DYSON:  Like I said, Anger

18  Management, I've had –

19       DEPUTY COMMISSIONER BLONIEN:  No, I'm

20  talking about vocational now.

21       INMATE DYSON:  Oh, vocational, okay.

22  Well, there's the watch repair, which is the

23  certificate that's at the bottom of the list

24  that you have.  I have chronos showing that I've

25  completed the janitorial services program that

26  was at Vacaville,  also clerical skills, typing,

27  so on and so forth.  There's a clerk-typist for

13

1  a number of years prior to this present position

2  that I have as a porter.

3       DEPUTY COMMISSIONER BLONIEN:  And what

4  are you currently reading?

5       INMATE DYSON:  In the way of what?

6       DEPUTY COMMISSIONER BLONIEN:  Book?

7       INMATE DYSON:  Basically magazines.  I

8  don't really –

9       DEPUTY COMMISSIONER BLONIEN:  You don't

10  read books?

11       INMATE DYSON:  No.

12       DEPUTY COMMISSIONER BLONIEN:  And are you

13  active in religious services?

14       INMATE DYSON:  Yes.

15       DEPUTY COMMISSIONER BLONIEN:  And – I

16  know you went to the Anger Management that was a

17  Muslim group.  Are you active in the Muslim

18  faith?

19       INMATE DYSON:  No, I'm a Christian.

20       DEPUTY COMMISSIONER BLONIEN:  You're

21  Christian?

22       INMATE DYSON:  Yes.

23       DEPUTY COMMISSIONER BLONIEN:  And you've

24  never had any history of drug or alcohol?

25       INMATE DYSON:  No.

26       DEPUTY COMMISSIONER BLONIEN:  You did

27  attend NA or AA for a long time.

14

1    INMATE DYSON:  I attended both NA and AA,

2  and along with transcendental meditation, which

3  also helps in the thinking process.

4    DEPUTY COMMISSIONER BLONIEN:  And that's

5  why you went to AA and NA, to help you in your

6  thinking process?

7    INMATE DYSON:  Right, to really

8  understand why I thought like I did prior to me

9  coming to prison.  And a lot of it was brought

10  on by my own self way of thinking.

11    DEPUTY COMMISSIONER BLONIEN:  So what

12  else are you doing currently that I should know

13  about?

14    INMATE DYSON:  Other than staying

15  disciplinary free, just working.

16    DEPUTY COMMISSIONER BLONIEN:  Makes for a

17  long day.

18    INMATE DYSON: Well, I – I meditate at

19  least once a day, and I go outside and I

20  exercise, and I just basically just stay – try

21  to stay disciplinary free.

22    DEPUTY COMMISSIONER BLONIEN:  And in

23  talking with other panels, they keep asking you

24  for more self-help and I know there's not a lot

25  available in the institution, but are you on any

26  waiting lists?

27    INMATE DYSON:  I've been on the waiting

15

1  list for the group therapy, the latest one, for

2  almost two years now.  So it's beyond my

3  control.

4      DEPUTY COMMISSIONER BLONIEN:  And this

5  institution actually has more than some other

6  institutions.  There's that Project Change.  Do

7  you know about that?

8      INMATE DYSON:  I'm not familiar with

9  that.

10      DEPUTY COMMISSIONER BLONIEN:  Are you

11  doing any lifers groups?

12      INMATE DYSON:  Well, that's what I'm

13  waiting on.  I'm on the - I've been on the

14  waiting list for something like two years now

15  for the - I believe it's Dr. Rainey (phonetic)

16  or it could be Beckman (phonetic), I'm not sure

17  which one has the group now, because it

18  constantly changing.

19      DEPUTY COMMISSIONER BLONIEN:  I want to

20  go over your psych report with you, and I'll get

21  these back to you, and it's very good to come in

22  with copies.

23      INMATE DYSON:  Okay.

24      DEPUTY COMMISSIONER BLONIEN:  Because you

25  have two volumes in your C-File.

26      INMATE DYSON:  Right.

27      DEPUTY COMMISSIONER BLONIEN:  And

16

1    sometimes things just get mis-filed or fall out,

2    and that way you have a complete record.

3         INMATE DYSON:  Yes.

4         DEPUTY COMMISSIONER BLONIEN:  So when Dr.

5    Howlin met with you, he pretty much referred

6    back to the report done by Dr. Reed, because you

7    were working at the same job that you were when

8    you talked to Dr. Reed, and that you hadn't had

9    any disciplinary action since your last psych

10   report and no mental health issues were noted by

11   Dr. Howlin.  So he referred back to Dr. Reeds

12   report, and under current diagnostic impressions

13   in the '03 report, there is no diagnosis of any

14   mental disorder or physical disorders under Axis

15   I, II, or III, and no notation of any drug or

16   alcohol problems.  That he talks about that your

17   risk for violent behavior within a controlled

18   setting is considered to be low relative to this

19   level-two population.  And he based it on

20   several factors, that you - although you did

21   receive a 115 for fighting in 1988, there hasn't

22   been any other violent 115's.  You have no

23   history of juvenile criminal behavior.  You're a

24   first-termer.  That the incident offense appears

25   to have been a single event born from the loss

26   of self control in a stressful situation.  That

27   you have good pre-incarceration work history,

17

1   and you've maintained a good work history during

2   your incarceration.  That talks about the

3   depression that you've been diagnosed with

4   during your institutional stay and you're going

5   through therapy, and there's no diagnosis of

6   depression at this time, and you're not on any

7   medication, is that correct?

8           **INMATE DYSON:**  No I'm not.

9           **DEPUTY COMMISSIONER BLONIEN:**  He states

10  that he administered two tests to you to assess

11  your risk for future violent behavior.  One, the

12  HCR20, indicated a low risk for future violent

13  behavior, and the HARE Psycopathy of Sociopathy

14  indicates non-presence of sociopathy.  And

15  notably, the low risk for future violent

16  behavior is the lowest category available.

17  Therefore, in light of these factors, your

18  violence potential is considered to be low

19  compared to other inmates, and if released to

20  the community, your violence potential is

21  clinically estimated to be no greater than that

22  of the average citizen.  I guess my only

23  question is, and again it sort of goes back to

24  maintaining your self control.  So in '03, did

25  you just reach a plateau and therefore you've

26  reached the ability to handle stress and control

27  yourself, and there's no other self-help needed?

18

1  Is that what you think?

2        INMATE DYSON:  Well, I - I believe that

3  I've learned over the years, being in this

4  stressful situation here, that there's other

5  alternatives to violence, and prior to even

6  getting to that stage of thinking, there's other

7  ways of dealing with problems before they become

8  a problem.  So over the years -

9        DEPUTY COMMISSIONER BLONIEN:  So someone

10  comes and cuts you off, you're driving, someone

11  cuts you off now, what's your thought process?

12        INMATE DYSON:  Oh, totally different.  I

13  can just let that go.  It doesn't mean anything.

14  It didn't mean anything as much as it did back

15  then, because of the different thought process.

16  So now I have no problem with that.

17        DEPUTY COMMISSIONER BLONIEN:  Are you

18  going to give me a clue what your thought

19  process is now?

20        INMATE DYSON:  Well, my thought process

21  is that - just a total different way of thinking

22  about things.  I'm not as - not as prone to

23  trying to have it a certain way without giving

24  something.  It's no longer a need to try to be

25  100% at whatever I did.  I don't have that

26  thought process anymore.

27        DEPUTY COMMISSIONER BLONIEN:  Does that

19

1  make you a less-functioning individual then?

2      INMATE DYSON:  No it doesn't.  I - it

3  just - it just a different way of thinking about

4  things.  I'm not as - as - what's the word I'm

5  looking for - I'm not as committed to doing

6  something 100% a certain way if it's not

7  necessary.  Life is too short, and it's too

8  stressful for that.

9      DEPUTY COMMISSIONER BLONIEN:  Okay, and

10  I'm going to return back to the Chair.

11      PRESIDING COMMISSIONER BRYSON:  All

12  right, thank you.  Sir, prior to the incident

13  offense, you were very involved in the world of

14  business and performing and job and things like

15  that, am I correct?

16      INMATE DYSON:  That's correct.

17      PRESIDING COMMISSIONER BRYSON:  All

18  right.  And you just told the Commissioner here

19  that you don't care to read.  Actually, that's a

20  bit of a switch or a dichotomy for me to - as to

21  your character.  Do you - you don't read, or

22  because you choose not to?  It seems to me you -

23  you seem very bright.  You present as a very

24  bright individual.  And I'm wondering, have you

25  ever had any interest in pursuing your

26  education?  I know it's difficult in here, but

27  it is possible, and you seem equipped to do

20

1   that.

2        INMATE DYSON:   Well when she asked about

3   what am I reading, in terms of reading books,

4   no, I usually read publications like magazines,

5   newspapers for current events.

6        PRESIDING COMMISSIONER BRYSON:   I see.

7        INMATE DYSON:   Leisure time, I may read

8   my bible, and just basically newspapers.  I'm

9   not into novels or stuff along that line.

10       PRESIDING COMMISSIONER BRYSON:   All

11  right.

12       INMATE DYSON:   And I also read aviation

13  magazines to keep myself abreast of the latest

14  things going on in the commercial aviation

15  industry, so I try to stay up to date on that

16  for when I do – so when I am released, I can be

17  somewhat up to date on the latest things going

18  on in the aviation community.

19       PRESIDING COMMISSIONER BRYSON:   That's

20  interesting.  What would – what's your passion?

21  What would you be interested in doing, given all

22  that – the capability to do that, as –

23  professionally?

24       INMATE DYSON:   Well, I believe it was at

25  my 2002 board hearing, I presented the board

26  with three letters from three airlines that were

27  – that responded solely based on my resume with

21

1   the type of work that I do on commercial

2   aircraft.  So I'd like to return back to doing

3   that, but given the homeland security situation,

4   I know that that may not be a possibility, so

5   working as – maybe working in a restaurant, or –

6          PRESIDING COMMISSIONER BRYSON:  Right,

7   okay.  The airline industry isn't – is in

8   jeopardy here today anyway, but –

9          INMATE DYSON:  Exactly.

10          PRESIDING COMMISSIONER BRYSON:  But I

11   just was interested in knowing what your

12   interests were, never mind what you might be

13   doing –

14          INMATE DYSON:  Still aviation – still

15   commercial aviation.

16          PRESIDING COMMISSIONER BRYSON:  That's

17   interesting.  Okay.

18          INMATE DYSON:  And also working with

19   youngsters in the community to possibly talk

20   about things that are going on in prison, and

21   crime in the community, because like I said, I

22   watch news, and I read the newspaper, so I'm

23   concerned in that area also.  That's something I

24   – that's somewhat of a passion I would like to

25   get involved with once I am released.

26          PRESIDING COMMISSIONER BRYSON:  Okay now,

27   you have two children, I believe?

22

1      INMATE DYSON:  Yes.

2      PRESIDING COMMISSIONER BRYSON:  And have

3  you kept in touch with them?

4      INMATE DYSON:  Through the mail.  They're

5  back east.

6      PRESIDING COMMISSIONER BRYSON:  And how

7  have they turned out - what are they doing?

8      INMATE DYSON:  They're doing fine.

9  They're working, and I have grandkids, so I'm

10 very proud of that.

11     PRESIDING COMMISSIONER BRYSON:  All

12 right.  What do they do?

13     INMATE DYSON:  My oldest son works as a

14 station manager for Avis Car Rental in Ottawa,

15 Canada, and my youngest son is attending

16 college.

17     PRESIDING COMMISSIONER BRYSON:  All

18 right.  Where?

19     INMATE DYSON:  Syracuse, New York.

20     PRESIDING COMMISSIONER BRYSON:  Okay, now

21 we just received - what you're presenting as a

22 resume and parole plans. Let's see, I - have you

23 - you have inquired to Delancey Street, which of

24 course is a superior halfway organization.  And

25 I have your reply here from them.  Obviously

26 many, many applicants wish to get into Delancey

27 Street.  If that's what you'd like to pursue?

23

1   Are you still pursuing that?

2        **INMATE DYSON:**  That would be an option.

3   Yes.

4        **PRESIDING COMMISSIONER BRYSON:**  Okay.

5   Obviously they will not commit until you are

6   prepared to actually commit to them, and then I

7   see you also have the Allied Fellowship Service.

8   Let me first point out that the Delancey Street

9   Foundation response to you was as of April 26,

10  2004, and that's out of their San Francisco

11  office, and Sandra Munoz, M-U-N-O-Z, the intake

12  coordinator wrote that, "If you're looking to

13  come to Delancey Street upon release, you can

14  call the facility nearest you or just arrive and

15  sit on our bench, where all prospective

16  candidates sit awaiting interview.  It's based

17  on counseling - not on counseling, but on

18  learning to live differently, on working,

19  getting educated, and helping others."  That

20  requires a two-year commitment.  So would you be

21  prepared to make a two-year commitment to

22  Delancey Street?

23       **INMATE DYSON:**  Yes, because of what I

24  briefly stated of my interests in trying to talk

25  to the youth about what's going on in the

26  community, the crime rate, and about what can

27  happen being incarcerated.

24

1          PRESIDING COMMISSIONER BRYSON:  Right.

2          INMATE DYSON:  So that peaked my interest

3     a lot.

4          PRESIDING COMMISSIONER BRYSON:  All

5     right.  And then you also have a generalized

6     non-specific response from Allied Fellowship

7     Service.  Tell me a little bit about them.

8          INMATE DYSON:  Well basically, they

9     provide job placement and services in dealing

10    with employment, transportation, clothing, those

11    things, for those who recently being released

12    from incarceration.

13         PRESIDING COMMISSIONER BRYSON:  So they

14    would attempt to assist you in obtaining all

15    these, including employment?

16         INMATE DYSON:  Yes.

17         PRESIDING COMMISSIONER BRYSON:  Okay, and

18    then also a July 8, 2004 letter from Doug, Yee,

19    that's Y-E-E, of the Northern California Service

20    League in San Francisco, stating "The emphasis

21    of this program is to assist men coming out of

22    prison to find employment, and address their

23    career goals and employment issues.  Regarding

24    employment, when you are paroled, please report

25    to your parole agent for a referral to the

26    nearest PEP provider."  All right.  "Should you

27    be paroling to San Francisco or Santa Clara

25

1  County, please come by and visit us."  All

2  right.  And then I have in hand your resume,

3  indicating that you would, if paroled to the Bay

4  Area, you would use public transportation, and

5  citing the places you would initially contact.

6  Your secondary employment you have is a general

7  laborer, such as restaurant work as a bus boy,

8  waiter, house cleaning, etc.  Car rental

9  service, cleaning cars, driving, etc.  I'll also

10  pick up aluminum cans if necessary.  All right.

11  And your recreational activities, you list bike

12  riding, beach combing, and counseling the youth

13  of the community about the ills of crime.  All

14  right.  And then I have also your resume

15  worksheet and your work history.  All right.

16  I'd like to clarify what actual certificates you

17  have - you have a certificate of watch repair,

18  do you have a certificate in janitorial service

19  - is that actually a certificate, or my

20  understanding is there are - Commissioner

21  Blonien, is - did you notice a certificate in

22  there -

23      DEPUTY COMMISSIONER BLONIEN:  That's what

24  - I'm looking through both volumes right now.

25      PRESIDING COMMISSIONER BRYSON:  Okay,

26  great.

27      INMATE DYSON: The chrono's right there in

26

1  the file.

2      PRESIDING COMMISSIONER BRYSON:  I'm not

3  looking for chronos, actually.  I'm looking at –

4  as a vocational certificate. (Indiscernible)

5  Are you –

6      INMATE DYSON:  I don't believe that I

7  did.

8      PRESIDING COMMISSIONER BRYSON:  There is

9  a certification in janitorial service, but it's

10  not available at each institution.

11      DEPUTY COMMISSIONER BLONIEN:  Right.

12      PRESIDING COMMISSIONER BRYSON:  Each

13  institution does it different.  Some just give

14  chronos.  Do you have chronos?  But – All right.

15  While we research that, let me go over the

16  support letters that you have received.  I have

17  an August 7, 2004 letter.  Who's Geneviere

18  (phonetic) Dyson?

19      INMATE DYSON:  That's my mother.

20      PRESIDING COMMISSIONER BRYSON:  Your

21  mother.  All right, and I believe we have

22  another letter here that you handed us.  I'm not

23  sure if that's the same letter or not.

24      INMATE DYSON:  There should be copies in

25  the file (Indiscernible) the one that I brought.

26  I have the originals, and the copies were placed

27  in the file.

27

1          PRESIDING COMMISSIONER BRYSON:  That's a

2    good thing, and yes, this is - you have the

3    original here.  Your mother, Mrs. Dyson's, J-E-

4    N-E-I-V-E-R Dyson, and she writes, "Concerning

5    my son, Harold Dyson, I know he was very sorry

6    for what he did, and has represented over and

7    over again.  I believe over the years you have

8    watched and observed him enough to know he is

9    sorry for his wrong, and is ready to come out

10   and start life fresh in the right way."  Okay.

11   And I'm glad you brought your originals, because

12   I think this is the only - that's the only one

13   of which we have a copy.  So I'll continue with

14   the others.  Sir, where do you anticipate

15   paroling to?  Where would you live if initially

16   paroled to?

17          INMATE DYSON:  Back to the San Francisco

18   Bay Area.

19          PRESIDING COMMISSIONER BRYSON:  And

20   anywhere specifically, or - what would be your

21   specific residence?

22          INMATE DYSON:  San Francisco.

23          PRESIDING COMMISSIONER BRYSON:  No, I

24   don't mean the city, I mean address, with

25   someone that - do you have anyone that you would

26   plan to parole with and live with?

27          INMATE DYSON:  Well that's why I have the

28

1   different organizations that were offering me a

2   place where —

3           PRESIDING COMMISSIONER BRYSON:   You would

4   live in a halfway place?

5           INMATE DYSON:   That's correct.

6           PRESIDING COMMISSIONER BRYSON:   Okay.

7           INMATE DYSON:   And I have —

8           ATTORNEY RUTLEDGE:   Though his brother

9   Donald does offer a place to live as well.

10          INMATE DYSON:   And that's in Sacramento.

11          PRESIDING COMMISSIONER BRYSON:   All

12  right.  Now, then we have the capability of

13  ordering to a county that was, that would not be

14  in the Bay Area, as long as it's in California.

15  Let me see if I can — all right.  So this is

16  Donald Dyson.  This letter is undated.  I don't

17  know if you have an envelope with a date on it?

18          INMATE DYSON:   It should be on the back

19  of the letter.

20          PRESIDING COMMISSIONER BRYSON:   I don't

21  see any date on this.  "I'm writing this letter

22  on behalf of my brother, Harold."  And this is

23  from Donald Dyson, D-Y-S-O-N.  "The years he has

24  been incarcerated and stayed out of trouble

25  should account for some consideration for him

26  having another chance at becoming a productive

27  citizen.  I am not taking it lightly the

29

1  horrible crime placed upon the victim and his
2  family.  For that we are all very sorry.  But I
3  don't see keeping Harold any longer is going to
4  change the events that took place so long ago.
5  I feel Harold could help others going through
6  things such as he's gone through.  I open my
7  home to Harold for as long as he'll live with
8  us, that is my wife and myself.  I also run a
9  room and boarding house, and would be willing to
10  offer Harold a position of maintenance helper
11  with a salary between six and seven dollars an
12  hour starting pay.  (Indiscernible)  for giving
13  him another chance."  All right, that's a very
14  substantive offer, I would say, from your
15  brother.  He offers both a place to reside and
16  also an initial job for you.  And the thing I
17  don't have is any date on that.  It would be
18  important to get that updated and make certain
19  that that offer still stands from a
20  documentation standpoint.  We also have letters
21  of support from Rose Ofili, O-F-I-L-I, this is
22  dated September 10, 2004.  It gives general
23  support.  It states that - how do you know Rose
24  Ofili?
25        INMATE DYSON:  That is my sister.
26        PRESIDING COMMISSIONER BRYSON:  That's
27  your sister, okay.  She's in Las Vegas, correct?

30

1        INMATE DYSON:  That's correct.

2        PRESIDING COMMISSIONER BRYSON:  She's

3    still in Las Vegas?

4        INMATE DYSON:  Yes.

5        PRESIDING COMMISSIONER BRYSON:  "I

6    believe Harold has demonstrated his remorse

7    (Indiscernible) improvement in his

8    (Indiscernible) our many telephone conversations

9    and visits.  I know Harold is not prison

10   material, and has always been a very good son,

11   brother, and a very good friend.  He has

12   maintained working status whenever possible

13   during his incarceration.  He has maintained a

14   reasonable and acceptable trouble-free status

15   during his incarceration and has counseled other

16   inmates regarding turning their lives around,

17   and upon their release to do something positive

18   with their lives and not return to prison."  And

19   this is from your brother - oops, I'm sorry.

20       INMATE DYSON:  The last letter is from my

21   sister, Mosetta (phonetic) - yes.

22

23       PRESIDING COMMISSIONER BRYSON:   Your

24   sister?  Garner?

25       INMATE DYSON:  Mosetta Garner

26       PRESIDING COMMISSIONER BRYSON:  Mosetta,

27   all right.  That's M-O-S-E-T-T-A, Garner, common

31

1   spelling.  That's September 15, 2005.  Writes

2   letter "to ask if you would give my brother,

3   Harold Dyson, parole.  This is not something he

4   planned.  He had no record in the court system.

5   He never got in trouble with the law before.  I

6   hope you will understand – I think the system

7   failed him."  And she references your

8   depression.  "He's not a hardened criminal, and

9   the whole family regrets the life that was

10  taken."  So that's support from your sister.

11  All right.  Have I missed anything that you –

12          INMATE DYSON:  No, that's

13  (Indiscernible).

14          PRESIDING COMMISSIONER BRYSON:  Okay.

15  All right.  Do you have anything further on

16  support or parole plans, Commissioner?

17          DEPUTY COMMISSIONER BLONIEN:  No.  I do

18  have some questions on his certification.

19          PRESIDING COMMISSIONER BRYSON:  All

20  right.  Oh lets – would you like to ask those

21  now?

22          DEPUTY COMMISSIONER BLONIEN:  Sir, your

23  watch repair was back in like 1987.

24          INMATE DYSON:  That's correct.

25          DEPUTY COMMISSIONER BLONIEN:  And then

26  your janitorial experience – is that what you,

27  like working in the clothing room, working as a

32

1    porter, working as a maintenance clerk –

2        INMATE DYSON:  No, the janitorial course

3    that I took, this was at Vacaville, and we

4    actually learned how to strip the wax floors and

5    maintain carpets and things of that nature.

6        DEPUTY COMMISSIONER BLONIEN:  And what

7    year was that?

8        INMATE DYSON:  That would have been in

9    those chronos there – it would have been 1988,

10   '87.

11       DEPUTY COMMISSIONER BLONIEN:  Okay.  So –

12   and – and you've been to board plenty of times

13   since then, and the board has always asked you

14   to upgrade vocationally, but since that time, I

15   haven't seen any waiting lists that you're on,

16   or any other attempts that you've made to get a

17   vocation while you're in the institution?

18       INMATE DYSON:  No.

19       DEPUTY COMMISSIONER BLONIEN:  I just

20   wanted to make sure I was right on that.

21       INMATE DYSON:  I have no problem with,

22   like I put in my parole plans, I have enough

23   skills, I believe, to, along with those two that

24   I picked up in here.

25       DEPUTY COMMISSIONER BLONIEN:  Well you –

26       INMATE DYSON:  I have – I believe I have

27   viable employment skills.

33

1    **DEPUTY COMMISSIONER BLONIEN:**  You

2    mentioned typing.  And I saw at the start you

3    were typing 20 minutes - 20 words a minute, and

4    you got up to 40 words a minute.  Are you better

5    than that now?

6        **INMATE DYSON:**  Yes, I'm still typing.

7        **DEPUTY COMMISSIONER BLONIEN:**  And what

8    are you typing now?

9        **INMATE DYSON:**  Personal letters.

10        **DEPUTY COMMISSIONER BLONIEN:**  And what

11    are you typing - how many words per minute?

12        **INMATE DYSON:**  Anywhere from 45 to 50.

13    I'm no longer working as a clerk, but this is

14    just on my time.  The clerk was - my clerking

15    skills are still maintained.

16        **DEPUTY COMMISSIONER BLONIEN:**

17    (Indiscernible) for a long time since — '02?

18    April 17, 2002.  And before that you worked in

19    the clothing room for about five months, and you

20    were on yard crew for about a year?

21        **INMATE DYSON:**  That's correct.

22        **DEPUTY COMMISSIONER BLONIEN:**  There's one

23    chrono I was interested in.  You got to the

24    visiting room late, and you cancelled the visit.

25    You said because there wasn't enough time.

26        **INMATE DYSON:**  Well what had happened

27    that particular day, I was on the yard, and they

34

1   called me for the visit late, so by the time I

2   got back into the housing unit to shower, I

3   would have had only five minutes, and that would

4   not have been worth, you know, my family to have

5   traveled that far for that short amount of time.

6        **DEPUTY COMMISSIONER BLONIEN:**  But they

7   were here already, right?

8        **INMATE DYSON:**  They had been sitting out

9   there for a number of hours.

10        **DEPUTY COMMISSIONER BLONIEN:**  So you

11   didn't even go and see them?

12        **INMATE DYSON:**  I couldn't.

13        **DEPUTY COMMISSIONER BLONIEN:**  So they

14   were frustrated, I'd bet, too.

15        **INMATE DYSON:**  Oh yes, very.  And it's

16   just happened again.

17        **DEPUTY COMMISSIONER BLONIEN:**  Just?

18        **INMATE DYSON:**  Most recently.

19        **DEPUTY COMMISSIONER BLONIEN:**  But I guess

20   I'd think, you know, five minutes is better than

21   nothing.

22        **INMATE DYSON:**  Well, what I failed to

23   mention, is that coming in from the yard dirty,

24   I needed to get back into the housing unit to

25   shower.  That wouldn't have left me with no time

26   at all for a visit.  I couldn't go out there,

27   coming off the yard dirty.

35

1          **DEPUTY COMMISSIONER BLONIEN:**  Okay.

2          **INMATE DYSON:**  Right, and it just

3     happened again.  My family came up, this was

4     about a month ago.  They — the visiting room

5     staff failed to call the unit to let them know

6     that I had a visit, and when I did — when they

7     did call, then they (Indiscernible) status.  So

8     my family had been sitting out there for two or

9     three hours waiting.

10          **DEPUTY COMMISSIONER BLONIEN:**  How

11    frustrating.

12          **INMATE DYSON:**  Yeah, it is.  But again,

13    dealing with those stressors like that, I've

14    learned to just let it go, I mean, it's not

15    life-threatening, you know, and I won't — it

16    doesn't bother me as much as it used to be,

17    simply because of my way of thinking and dealing

18    with those issues.  I don't get angry about it

19    anymore.

20          **DEPUTY COMMISSIONER BLONIEN:**  That's my

21    only question, Commissioner.

22          **PRESIDING COMMISSIONER BRYSON:**  Thank

23    you.  All right, we sent out 3042 notices.

24    Those notices go to agencies having a direct

25    interest in your case.  We have received a reply

26    from the City of Oakland.  This is written by

27    Richard W. Andreotti, that's A-N-D-R-E-O-T-T-I,

36

1    Sergeant of Police, Oakland Police Department,

2    and James Emery, E-M-E-R-Y, Police Lieutenant,

3    Oakland Police Department.  "I've learned the

4    above-named inmate is to appear before the Board

5    of Prison Terms for a hearing on January 24,

6    2006.  I reviewed the murder case that sent Mr.

7    Dyson for prison for life, and I have learned

8    the following facts.  I researched the case and

9    learned that on February 6, 1983, Ky Chu Hung

10   (phonetic) was murdered at 1500 San Pablo

11   Avenue.  Harold Dyson was involved in an auto

12   collision with Ky Hung.  While an Oakland Police

13   Officer was present and investigating the

14   collision, Dyson walked to Hung's vehicle and

15   shot Hung to death.  According to witnesses,

16   Dyson was not provoked by Hung.  Dyson placed a

17   police officer in peril, and nearly forced that

18   officer to discharge his own firearm in

19   protection and fear for himself and others.

20   Dyson was fortunate that the killing of Hung did

21   not initiate a sequence of events that were

22   detrimental to uninvolved citizens.  Dyson held

23   no remorse for his actions, and certainly at no

24   time did Dyson acknowledge the sorrow felt by

25   the family and friends of the victim.  Harold

26   Dyson showed a cold criminal mind and a reckless

27   disregard for human life in the murder of Ky

37

1    Hung.  At the time of the incident, inmate Dyson

2    clearly represented a significant danger to the

3    Oakland community.  It is just such reckless

4    criminal behavior as this that is directly

5    attributable to the high level of fear our

6    residents and merchants must endure in some of

7    our community's neighborhoods as well as the

8    large number of murders that are committed each

9    year in Oakland.  This is an example of the type

10   of senseless violence that continues to plague

11   our city.  It is obvious that Harold Dyson has

12   no respect for human life.  The Oakland Police

13   Department requests that in view of the

14   circumstances surrounding the murder of Ky Hung

15   by Harold Dyson, that Mr. Dyson not be paroled,

16   but rather to be made to serve the remainder of

17   his life sentence."  Commissioner, do you have

18   any questions of the inmate at this time?

19          DEPUTY COMMISSIONER BLONIEN:  No I don't.

20          PRESIDING COMMISSIONER BRYSON:  All

21   right.  Counsel, do you have any questions of

22   the inmate?

23          ATTORNEY RUTLEDGE:  No.

24          PRESIDING COMMISSIONER BRYSON:  All

25   right.  Counselor, would you like to make a

26   closing statement?

27          ATTORNEY RUTLEDGE:  Thank you.

38

1          **DEPUTY COMMISSIONER BLONIEN:**  Let me turn

2     the tape, and that way (Indiscernible)

3     [END OF SIDE ONE - TURNED TAPE OVER]

4          **DEPUTY COMMISSIONER BLONIEN:**  Okay, we're

5     back on record, side two.

6          **ATTORNEY RUTLEDGE:**  In going back, what,

7     22 years now to this commitment offense, Mr.

8     Dyson was working, he was at the time according

9     to reports in his file, trying to support his

10    mother.  She was 62 at the time of the offense?

11         **INMATE DYSON:**  Yes.

12         **ATTORNEY RUTLEDGE:**  And I would note too,

13    for his social history, his mother, according to

14    several reports in his file, was - picked cotton

15    in Mississippi and had ten children?

16         **INMATE DYSON:**  Yes.

17         **ATTORNEY RUTLEDGE:**  And came to San

18    Francisco in '64 to - and worked to save enough

19    money to bring her nine children that were still

20    under age to San Francisco, to give them a

21    better life.  And I think it's really neat that

22    his - he has a son who's in college and another

23    who's a manager at Avis, to see how that, you

24    know, that sort of paid off in some ways, and

25    unfortunately at the time of the offense, Mr.

26    Dyson was trying to support his mom, he was

27    working very hard, he was under stress, he - at

39

1   the time too, was on Prolixin (phonetic),

2   suffering from several ailments.  The same year

3   that he entered his plea bargain, they did –

4   they ordered a psychological evaluation, and –

5   and this was prepared in 1984, February of '84,

6   it says – I think this is – well actually, this

7   is his CDC evaluation, yeah.  His CDC

8   evaluation, he admits the offense and fully

9   accepts responsibility.  The offense appears to

10  be totally out of character for this man, and

11  apparently was a result of his mental condition

12  at the time as documented in attachments to the

13  POR.  He's never been arrested before, and

14  evidenced no propensity toward a criminal

15  lifestyle.  He has accepted the fact that he's a

16  lot of time to serve and wants to make use of

17  that time to develop some viable and vocational

18  skills.  He should make adjustment and be a

19  conforming inmate."  So his condition at the

20  time was quite impaired due to the things that

21  he was suffering, and his – as he said, the way

22  that he approached things, his thought process,

23  he was 26 years old, but still the CDC felt

24  okay, this guy's – this was out of character for

25  him, he's going to do well in prison.  And that

26  has been the case for Mr. Dyson.  I think

27  they're quite on point.  Since he's been in

40

1    prison, he has completed a voc in watch repair,

2    but he's held numerous jobs.  He did – according

3    to him, he completed a janitorial services

4    program, he knows how to type, and his different

5    jobs have really provided him probably the best

6    training for the type of jobs he'll get working,

7    and he may not be able to work at the airport,

8    one thinking he might be eligible for, once he's

9    out for a while, is working for private

10   companies where they, you know, people charter

11   planes.  He might be able to work for an outfit

12   like that.  So that's possible, because it seems

13   like his interests are in aviation.  So I think

14   aside from manual labor, he still may have other

15   opportunities in his chosen profession.  And he

16   hasn't had a 115 in 13, almost 14 years.  He

17   hasn't had a 128 since 1998, and he's expressed

18   to the board how he's done that – how he's

19   managed to go from somebody flew off the handle

20   beyond what any normal person would do, takes

21   the life of this other person, and you know,

22   took the life of that person, that person's

23   family's lives, his own family, himself, and to

24   a person today who is able to cope with

25   stresses.  I mean, as Deputy Commissioner

26   Blonien said, there's a lot more stressful in

27   prison, there's gonna be a lot more stress out

41

1    there, but he seems to be – he's almost 49?

2        **INMATE DYSON:**  Yes.

3        **ATTORNEY RUTLEDGE:**  And he's grown up

4    quite a bit in the last 22 years, and I think

5    his comments support that he is able to face

6    life situations in a – in a more normal manner,

7    and I think too his – his age is going to make a

8    difference.  How he takes care of himself – he

9    hasn't just done self-help with NA and AA, he's

10   been involved in Anger Management, Meditation,

11   and he thinks about the community.  He wants to

12   reach out to other youth that are out there.

13   Oakland's a good place – they have a lot of

14   problems there.  He did complete life skills

15   with Dr. Bankman (phonetic), and he physically

16   takes care of himself.  He hasn't just thrown in

17   the towel.  This is his seventh hearing, but

18   he's able to come in here each time, taking care

19   of himself with his sight set on being paroled.

20   And he has also parole plans as far as – he's

21   made contact with all the different agencies

22   that can help him, he's tried to find out who

23   his parole officer is going to be, and he has a

24   back-up plan in Sacramento to live with his

25   brother, but if he gets paroled back to Alameda

26   County, he's prepared to take any job.  And as

27   his work record has shown in prison, he will

42

1   work and get a job.  He's not going to be

2   sitting around idle.  He's still on a wait list

3   for group therapy, he maintains contact with his

4   family, has an interest in his grandchildren, he

5   keeps abreast of current issues involving

6   aviation, he - enough to know - I believe him

7   when he says he's reading newspapers and

8   magazines to realize it's gonna be difficult

9   with his record to get a job based upon the

10  current security issues involving our nation.

11  And - too, I would note that at the time,

12  another positive thing was, at the time of this

13  terrible offense, he took responsibility for it.

14  He has always taken responsibility for what he

15  did.  And through, apparently during his

16  therapy, has been able to function well - very

17  well in prison without the help of medication.

18  So there's not even a risk that if he's out and

19  he doesn't have his medication like we sometimes

20  worry, that he'll be able to function without

21  medication.  He's not going to need the POC - it

22  won't be a mandatory situation.  So based upon

23  all - everything in his file, his history here

24  at the institution, and his comments today, I

25  would urge the board to give Mr. Dyson a parole

26  date.

27          PRESIDING COMMISSIONER BRYSON:  All

43

1   right.   Thank you sir.   We'd like to now give

2   you an opportunity to make a closing statement

3   regarding your suitability for parole.

4        INMATE DYSON:   Well first, I'd like to

5   say, foremost, that I express my sincere sorrow

6   to the victim's family, and that I will continue

7   to pay that debt to society as long as I live.

8   And also that the number of years that I've

9   spent incarcerated, I've learned to - like I

10  say, readjust my thinking about dealing with

11  different stressful situations, and I understand

12  what the Commissioner was saying earlier about

13  society being much more stressful.   I do keep

14  abreast via the news, newspapers about what's

15  going on out there, and I feel that I do have

16  the stability of a stable mind in place to deal

17  with that.   So, that's all I have to say.

18        PRESIDING COMMISSIONER BRYSON:   All

19  right.   Thank you.   We appreciate your comments.

20  We will recess for deliberations.   The time is

21  10:17.

22                  R E C E S S

23                  --oOo--

24

25

26

27

44

```
1        CALIFORNIA BOARD OF PAROLE HEARINGS
2                    D E C I S I O N
3        DEPUTY COMMISSIONER BLONIEN:   We are back
4    on record.
5        PRESIDING COMMISSIONER BRYSON:   All
6    right, the time is 10:36.  In the matter of
7    Harold Dyson, sir, the panel reviewed all
8    information received from the public and you,
9    and relied on the following circumstances in
10   concluding that you are not suitable for parole,
11   and would pose an unreasonable risk of danger to
12   society or threat to public safety if released
13   from prison.  The offense was carried out in an
14   especially cruel and callous manner, in that on
15   February 6, 1983, an innocent citizen, Ky Chu
16   Hung was murdered at 1500 San Pablo Avenue.  You
17   involved with an auto collision with him, and
18   while an Oakland police officer was present and
19   investigating the collision, you walked over to
20   Hung's vehicle and shot him to death.  According
21   to witnesses, you were not provoked by Hung.
22   The offense was carried out in a dispassionate
23   manner, demonstrating an exceptionally callous
24   disregard for human suffering in that you did
25   not check on his welfare afterwards, however to
26   your credit you did surrender to police.  It was
27   HAROLD DYSON   C-80683  DECISION PAGE 1   1/24/06
```

45

1  also carried out in a manner that disregarded
2  public safety, in that others could have been
3  injured or killed, and you had a clear
4  opportunity to cease, but continued your act.
5  As to your prior record, you have no prior
6  record as a juvenile, or arrests or convictions
7  as an adult. To your credit, you were
8  apparently on Prolixin at the time of this
9  offense, and under stress of your mother - for
10  your mother also at the time of this offense.
11  As to your institutional behavior, you have
12  programmed in a limited manner. You are to be
13  commended for staying abreast of current issues
14  in the world. You also have exceptional good
15  worker reports while in prison. Vocationally,
16  you have obtained a certification in watch
17  repair, and have obtained - made progress in
18  janitorial service. Also, you have worked as a
19  clerk and typist. However, you have not had any
20  self-help or therapy since 2002. And the board
21  believes that you have not sufficiently
22  participated in elf-help or therapy. You are to
23  be commended for being discipline free, since
24  basically 1998, your last 128 was in 1998, of
25  which you've only received five. You do have a
26  record of eight 115's, serious disciplinary
27  **HAROLD DYSON    C-80683    DECISION PAGE 2    1/24/06**

46

1   violations, however the last was - last two were

2   administrative, and the last one, also being

3   administrative, occurred in 1992. Now you have

4   displayed positive behavior in prison in that

5   you have reached out and you also have continued

6   to stay in contact with your family. The psych

7   reports of September 25, 2003 by Dr. Reed and

8   February 16, 2005 by Dr. Howlin, that's H-O-W-L-

9   I-N, thank you, did not oppose release, they are

10   not totally supportive of release, they indicate

11   that you do need (Indiscernible) therapy to

12   continue - one-on-one therapy and self-help. As

13   to your parole plans, sir, the only firm parole

14   plan that this panel has before it is that of

15   your brother, Donald Dyson, who is offering a

16   residence in the Sacrament area, and initial

17   employment in his room and boarding house for

18   six to seven dollars an hour. Actually this

19   panel finds your application for Delancey Street

20   may not be appropriate, because they are more

21   directed toward treatment for drug abusers. And

22   this panel also examined your parole plans as

23   regards marketable skills. And sir, watch

24   repair is, we feel, an outdated vocation. We

25   feel that your janitorial service, basically, is

26   - has good potential, but you have no job offers

27   **HAROLD DYSON    C-80683  DECISION PAGE 3    1/24/06**

47

1   -   firm job offers, that would enable you to

2   be self-sufficient in the community.  So we are

3   looking for more firm job offers in this area.

4   Penal Code 3042 responses indicate opposition to

5   finding of parole suitability, specifically by

6   the Oakland Police Department.  In a separate

7   decision, the hearing panel finds it's not

8   reasonable to expect that parole would be

9   granted at a hearing during the following two

10   years.  Specific reasons for this finding are as

11   follows.  The offense was carried out in an

12   especially cruel and callous manner, in that one

13   Ky Chu Hung was involved in an auto collision

14   with you, and while an Oakland Police Officer

15   was present and investigating the collision, you

16   walked to Hung's vehicle and shot Hung to death.

17   According to witnesses, you were not provoked by

18   Hung.  The offense was carried out in a

19   dispassionate manner, demonstrating an

20   exceptionally callous disregard for human

21   suffering, in that you did not check on the

22   victim's welfare, however you were to be

23   commended for surrendering to police.  You

24   disregarded in this act the risk to public

25   safety, and you had a clear opportunity to cease

26   or to handle your stress in other ways, but you

27   **HAROLD DYSON**   **C-80683**   **DECISION PAGE 4**   **1/24/06**

48

1   -   continued.  The motive for the crime,

2   moreover, was very trivial in relation to the

3   offense, in that most citizens seek other ways

4   to release tension and stress, but you did not.

5   Sir, in denying your parole for two years, we

6   are placing you on the 2008 calendar for your

7   next subsequent hearing.  If this decision is

8   final, you will not get paroled.  The board will

9   send you a copy of the decision.  It will

10  indicate the reasons you did not get paroled.

11  If this decision is not final, the board will

12  set up another hearing.  You can read the laws

13  about your hearing at California Code of

14  Regulations, Title 15, Section 2041.  The board

15  recommends no more 115's or 128A's, get self-

16  help, learn a trade that's viable in the current

17  market, and get therapy.  Sir, I would like to

18  make a statement on behalf of the panel, that we

19  feel that basically, we need to see more from

20  you in terms not only of parole plans, but in

21  terms of your real understanding of what's

22  involved here.  You appear to this panel to be

23  still under quite a bit of stress, personally,

24  still a fairly uptight individual.  That's not

25  surprising in an institution, certainly, but in

26  order to feel the public safety is not at risk

27  **HAROLD DYSON    C-80683   DECISION PAGE 5    1/24/06**

49

1    in granting you parole, it's important to us to

2    see that you can reach out, that basically you

3    have moved beyond the level of stress that would

4    make you a threat to society.  Commissioner, do

5    you have anything further?

6        **DEPUTY COMMISSIONER BLONIEN:**  Yeah, I do.

7    You understand this parole process, I think,

8    very well, in that we're just the first word.

9    And if we had given you a date today, there's

10   levels of review that brings the decision to the

11   Governor's office.  And with what you've given

12   us, there's no way the Governor would sign off

13   and give you a date.  It's your responsibility

14   to give us the ammunition that allows us to give

15   you a date, and then that date be approved so

16   that you actually get to go out.  It may be kind

17   to keep on giving you one-year denials, but the

18   reality is, you have work to do.  And unless you

19   get that work done, you're not going to get the

20   date.  And you have great potential.  And you

21   could get a date, and it could be approved by

22   the Governor, and you've got to get to work and

23   I hope you do it.

24       **PRESIDING COMMISSIONER BRYSON:**  All

25   right.  Good luck, sir.

26       **INMATE DYSON:**  Okay.

27   **HAROLD DYSON    C-80683   DECISION PAGE 6    1/24/06**

50

1       PRESIDING COMMISSIONER BRYSON:   That

2   concludes the hearing.   The time is 10:43.

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS          MAY 2 4 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   HAROLD DYSON    C-80683   DECISION PAGE 7    1/24/06

51

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, KALANI ALLRED, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 50, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF HAROLD

DYSON, CDC NO. C-80683, ON JANUARY 24, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated FEBRUARY 10, 2006, at Sacramento County,

California.


_____
KALANI ALLRED
TRANSCRIBER
**PETERS SHORTHAND REPORTING**