1  HAROLD D, DYSON
   C-80683   Z-341-L
2  P.O. BOX 689
   SOLEDAD, CALIF.93960-0689
3

4  PETITIONER IN PRO PER.

...

9              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 IN RE:                          CASE NO" C 07-04955 WHA
                                   MOTION AND NOTICE OF MOTION TO
14     HAROLD D, DYSON.            TAKE JUDICAL NOTICE PER:F.R.E.
                                   201 (in re:ronald singler,
15 ON HABEAS CORPUS.               C 054634,2008.cal,app, 3rd dist

19              MOTION TO TAKE JUDICAL NOTICE

21 I,HAROLD D, DYSON, declare that i am the petitioner in this action, hereby do
22 pray this court to take judical notice of the recent state court of appeals
23 for the third appellate district of california in the case of in re: ronald
24 singler C 054634 cal,app.2008, wherein the california state supreme court did
25 grant review in that case and transfred the case back down to the third appe-
26 llate district court with instruction regarding a new set of standards of re-
27 view, applying the judical gloss that in the in re: scott,in re: elkins, and

1.

also in re: lee placed on the standard of review articulated in in re: rosenkrantz. " a court may overturn the board denial of parole based solely on the nature of the commitment offense if,(1.) a significant period of time has passed since the crime. (2.) there is uncontroverted evidence of the inmates rehabilitation, and (3.) the crime was not committed in such an especially heinous,atrocious, or cruel manner so as to undermine the evidence that the inmate's rehabilitative efforts demonstrate he no longer would be a danger to society if released on parole ".

this <u>recent decision</u> by the california state supreme court is relevant to this petitioners case as the california state supreme court has now <u>adopted</u> a new set of standards of reviews which this petitioner could not have benefited from at the time his petitions was before that same court back in <u>june 20,2007</u> i am asking this court to take judical notice of certain findings and holdings in the <u>in re: singler case.</u> as they are very relevant to adjudicating the very claims in this petitioners petitions that is before this court.
this petitioner respectfully submits that in the instant matter that is before this court, there is not a <u>modicum</u> of <u>some evidence</u> having an <u>idicia of relibity</u> to support the boards findings that this petitioners is unsuitably for parole. the boards <u>repeated</u> failure to recognize this petitioners <u>plea bargain</u> is a fundamental violation of this petitioners due process rights.
therefore this petitioner request this court to take judical notice of the recent findings in (<u>IN RE:ronald singler).</u> attached hereto as "EXHIBIT "A" ".

///
///
///

**DECLARATION OF HAROLD D, DYSON**

I DECLARE THAT UNDER PENALTY OF PERJURY THAT THE FOREGOING TO BE TRUE. THIS DECLARATION IS EXCUTED ON THIS THE 3 DAY OF MAY, 2008 HERE AT C.T.F. SOLEDAD, CALIF.

MAY 3, 2008                                    HAROLD D, DYSON.

                                               /s/ Harold D. Dyson

///
///
///

# EXHIBIT A

LexisNexis® Total Research System                                                       Switch Client | Preferences | Sign Off | ? Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Transactional Advisor | Counsel Selector | History | 

Source: Legal > /.../ > CA State Cases, Combined
Terms: **singler** and date geq (02/28/2008)  (Edit Search | Suggest Terms for My Search)

2008 Cal. App. LEXIS 408, *

In re RONALD **SINGLER** on Habeas Corpus.

C054634

COURT OF APPEAL OF CALIFORNIA, THIRD APPELLATE DISTRICT

2008 Cal. App. LEXIS 408

**March 26, 2008**, Filed

**PRIOR HISTORY:** [*1]
Superior Court No. 64078.
**Singler** (Ronald) on H.C., 2007 Cal. LEXIS 4197 (Cal., Apr. 25, 2007)

**DISPOSITION:** Petition granted.

**CORE TERMS:** parole, public safety, inmate's, prison, anger, prisoner, suitability, murder, stress, unsuitable, atrocious, violent, gravity, self-help, degree murder, parole date, unsuitability, emotional, rural, cruel", marriage, impulse, psychological evaluations, commitment offense, especially heinous, rehabilitative efforts, incarceration, shooting, shotgun, remorse

**COUNSEL:** Michael Satris, under appointment by the Court of Appeal, for Petitioner.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Jennifer A. Neill, Heather M. Heckler and Andrew R. Woodrow, Deputy Attorneys General, for Respondent.

**JUDGES:** Opinion by Scotland, P. J., with Nicholson and Raye, JJ., concurring.

**OPINION BY:** Scotland

**OPINION**

**SCOTLAND, P. J.**—ORIGINAL PROCEEDINGS.

In September 1982, Ronald **Singler** murdered his wife with a shotgun during a heated domestic argument. He was convicted of second degree murder and was sentenced to an indeterminate term of 15 years to life in state prison.

In 2006, the Board of Parole Hearings (the Board) found that **Singler** was not suitable for parole. Members of the Board acknowledged that what **Singler** has "been doing while ... in prison is very impressive," i.e., his conduct as a prisoner has been "extremely positive" "both for self-enhancement and for the enhancement of other people's lives" in that **Singler** has benefited, as have others, from "all the things that [he has] done" while incarcerated. Nevertheless, because of the "terrible" manner [*2] in which he murdered his wife (after arguing with her, he went into the garage, loaded a shotgun, and fatally shot her in the living room while their two young children were in the house) and then disposed of the body (by dumping it in a rural area), Board members concluded **Singler** had not persuaded them that he has demonstrated sufficient "insight" regarding what caused him to deal with his anger in such a violent way to convince them that, if released on parole, he would not react in a

violent manner if future events cause him to become angry. In other words, the Board found that **Singler** would pose a danger to public safety if released on parole at that time.

On February 1, 2007, **Singler's** petition for writ of habeas corpus was summarily denied by this court. In concluding **Singler** did not make a prima facie showing for relief, we strictly construed the California Supreme Court's holding in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal. Rptr. 2d 104, 59 P.3d 174] as compelling us to deny the petition. This was so, we believed, because the Supreme Court said in no uncertain terms that (1) the Board may deny parole to an inmate with an indeterminate prison term who has reached the minimum eligible parole release date [*3] if "it determines that public safety requires a lengthier period of incarceration," (2) in making this determination, the Board has *great, indeed almost unlimited, discretion* based on its "attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts" (*id.* at pp. 654, 655), (3) judicial review of the denial of parole is "extremely deferential" to the Board's decision (*id.* at p. 665), (4) a court does not independently assess the merits of the Board's analysis (*ibid.*), (5) a court engages only in "limited judicial review" (*id.* at pp. 625, 657, 658) to determine whether the Board's decision was "based upon an individualized consideration of all relevant factors" (*id.* at p. 655) and is "supported by some evidence" (*id.* at pp. 625, 658, 677), such that the decision is not "arbitrary and capricious" (*id.* at pp. 626, 657, 677), (6) "[o]nly a modicum of evidence is required" (*id.* at pp. 626, 677) and "the weight to be given the evidence" is a matter within the Board's discretion (*id.* at p. 677), (7) consequently, "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability [*4] for parole far outweighs evidence demonstrating unsuitability for parole" (*id.* at p. 677), (8) as long as the Board's decision "reflects due consideration" of all the factors bearing on parole suitability and is supported by some evidence, the decision must be upheld (*id.* at p. 677), (9) the manner in which the crime was committed is one of the factors bearing on parole suitability (*id.* at p. 653), (10) the "nature of the [inmate's] offense, alone, can constitute a sufficient basis for denying parole" if "certain circumstances" of the offense "involve particularly egregious acts beyond the minimum necessary to sustain a conviction" (*id.* at pp. 682, 683), (11) although the fact that the inmate's "emotional stress and motivation for the crime" might be viewed as reducing his or her culpability, "the importance attached to this circumstance is left to the judgment of the [Board]" (*id.* at p. 679), (12) accordingly, judicial review "strictly is limited to whether some evidence supports the [Board's] assessment of the circumstances of [the] crime—not whether the weight of the evidence conflicts with that assessment or demonstrates that [the inmate] committed the offense because of extreme [*5] stress" (*id.* at p. 679).

Our review of the record and application of legal principles that were articulated by the California Supreme Court prior to our initial review of **Singler's** petition for writ of habeas corpus led us to conclude the Board undertook an individualized assessment of all the factors bearing upon suitability for parole and did not act arbitrarily or capriciously in finding that, despite his conduct while incarcerated, his crime involved egregious acts beyond the minimum acts necessary to support his conviction and demonstrated he remained a danger to the public (the Board viewed the crime as a calculated shooting in the living room of the couple's home while their young children were present in the house, followed by a callous disposal of the body). Hence, we summarily denied the petition on the merits.

The California Supreme Court granted **Singler's** petition for review and transferred the matter to this court, with directions to vacate our denial of the petition and to order the Board to show cause why it "did not abuse its discretion and violate due process in finding petitioner unsuitable for parole in June 2006, and why petitioner remains a danger to public safety. [*6] (See, Pen. Code, § 3041; *In re Rosenkrantz[,supra,]* 29 Cal.4th [at p.] 683; *In re Elkins* (2006) 144 Cal.App.4th 475, 496-498 [50 Cal. Rptr. 3d 503]; *In re Lee* (2006) 143 Cal.App.4th 1400, 1408 [49 Cal. Rptr. 3d 931]; *In re Scott* (2005) 133 Cal.App.4th 573, 594-595 [34 Cal. Rptr. 3d 905].)" (Order granting petn. review, Apr. 25, 2007.) This court issued the order to show cause, as directed, and the Board has filed its return.

The Supreme Court's order—signed by the author of *In re Rosenkrantz, supra*, 29 Cal.4th 616 and five other members of the court (only Justice Baxter did not endorse the order)—indicates to us the Supreme Court has endorsed subsequent Court of Appeal decisions that give courts greater leeway in reviewing the Board's determination that an inmate remains a danger to public safety.

No longer giving the Board the deference to which we thought it was entitled (*In re Rosenkrantz, supra*, 29 Cal.4th at pp. 655, 665, 677, 679), we must now conclude that its decision finding **Singler** unsuitable for parole is not supported by the evidence presented at the time of the hearing.

FACTUAL AND PROCEDURAL BACKGROUND

On the night of September 3, 1982, during an argument with his wife, Gayle, **Singler** got a shotgun from the garage, loaded it, and fatally **[*7]** shot Gayle in the living room while their children were asleep in the house. [1] According to Debbie G., who was Gayle's friend and a neighbor, **Singler** and Gayle had been having marital difficulties for months, **Singler** had been mentally and physically abusive, and he had previously threatened Gayle with a shotgun. The two women planned to leave their husbands and live together.

**FOOTNOTES**

[1] Because **Singler** and the victim shared the same last name, we refer to the victim by her first name, Gayle, for simplicity and to avoid confusion.

According to **Singler's** statement in the probation report prepared for the sentencing hearing, the couple had been having marital difficulties due to Gayle's compulsive spending and her unusual attachment to Debbie G. On the night of the murder, Gayle and Debbie G. returned from Sacramento about 9:00 p.m. An argument ensued, and Gayle told **Singler** about a recent sexual affair and her plans to divorce him, take the children, and leave **Singler** destitute. All of the emotions and anxieties that had been building "just went to a point of no control," and he shot Gayle. When their daughter awakened upon hearing the gunshot, **Singler** told her he had shot a skunk. **Singler** then **[*8]** drove the children to a friend's house, returned home for Gayle's body, and dumped it in a rural area.

On the night of the murder, Debbie G. attempted to telephone Gayle, who did not answer the call. Debbie G. later saw **Singler's** truck backed up against the front steps of the residence. When she telephoned again, **Singler** answered the phone but would not let her speak to Gayle, stating they had worked everything out and she was asleep and could not be awakened. When Debbie G. went to the house, **Singler's** truck was gone, the children were missing, and the front porch appeared wet. Debbie G. returned home and telephoned the police.

The responding officers found bloodstains on the deck and in the house. While they were examining the residence, **Singler** arrived and explained that his wife was spending a week in Lake Tahoe. He stated he had left the children with friends because his wife and he had been arguing. After being informed of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L. Ed. 2d 694, 86 S. Ct. 1602]), **Singler** initially denied any wrongdoing but eventually admitted shooting Gayle and dumping her body in a rural area. He showed the officers where he left Gayle, and they recovered **[*9]** her body.

**Singler** entered a "slow plea" to an unlawful killing using a firearm, with the trial court determining whether the killing was second degree murder or voluntary manslaughter. The court found **Singler** guilty of second degree murder. At sentencing, the court struck the firearm use enhancement, observing: "[T]here are different kinds of second degree murder. There are those that arise out of more deliberate action in the course of the crimes that are totally without justification. ... In this particular case, I recognize that—although I disagreed with the defense over the term of voluntary manslaughter—I do find second degree murder. I never the less recognize it did revolve out of a family dispute for which Mr. **Singler** will pay dearly for quite a while ... ."

After **Singler** was sentenced to a prison term of 15 years to life, the Board set January 30, 1991, as his minimum parole eligibility date.

**Singler** has no juvenile record or other criminal arrests or convictions. While in prison, he has participated in numerous programs concerning anger management and impulse control. He has completed more than 100 college credits and become active in the Buddhist religion, which has further **[*10]** taught him how to "control" irritation and anger and "not act [i]n anger." He has engaged in volunteer activities, receiving numerous "laudatory chronos," and has worked consistently as a plumber or furniture refinisher. His work supervisor's reports indicate **Singler** has exceptional work habits and skill levels. He is described as a model prisoner who has an "exemplary disciplinary history," other than the destruction of a blanket in 1983.

According to various psychological evaluations, **Singler** is "sincerely" ashamed of what he did and remorseful for the pain he caused others. He has reconciled with his children, who write to him and want him to become a part of their lives. His daughter has written several letters asking that he be paroled. In addition, Gayle's mother had no objections to **Singler** being paroled.

An evaluation prepared by Dr. R. O'Brien, a psychotherapist, in 2002, noted the following: **Singler's** "loss of impulse control" rose to the "level of violence" at the time of the offense. Multiple factors contributed to this result, including (1) tensions mounted in the marriage over a long period of time, with **Singler** "holding onto the idea that his marriage could work again," **[*11]** (2) **Singler** experienced a "sudden and dramatic escalation" in his "baseline level of stress and conflict" and "feelings of betrayal by a person for whom he had trusted and cared," and (3) the "circumstances ... did not allow him to process what was happening or cool off" before reacting.

In Dr. O'Brien's view, **Singler** had "taken steps in order to decrease his risk factors for future violent behavior," including "learning and practicing stress management and relaxation techniques such as mediation," and completing numerous self-help programs. And his "behavior and record since incarceration reflect[ed] an ability to manage his emotions and avoid conflicts appropriately." In addition, psychological testing indicated that **Singler** had "emotional and behavioral stability." Concluding that **Singler** posed a "moderate to mild risk of violent behavior," O'Brien stated: "Factors that may worsen Mr. **Singler's** mental state and relative risk of violence include his experiencing the acute loss of significant relationships or feelings of sudden betrayal in [a] relationship in which he is emotionally invested."

In May 2005, at **Singler's** eighth parole hearing, the Board found that he was suitable for **[*12]** parole after he had served 22 years of his 15-years-to-life prison term. In reaching this conclusion, the Board took into consideration the gravity of the crime; the circumstances that led to it (**Singler** was experiencing marital difficulties, was "in the heat of an argument" with the victim, and was under "significant stress"); his remorse and acceptance of responsibility; his "reasonably stable relationships with other people, apart from the difficulty that he had in his marriage"; his lack of other criminal history; his participation in numerous self-help programs; his "positive institutional behavior"; the favorable psychological evaluations of **Singler;** his "realistic parole plans"; and the support he had from his family, including his and the victim's daughter who urged that **Singler** be paroled. The Board concluded that "because of his maturation" since the killing of his wife, **Singler** had "a better understanding of himself and how he should have handled the situation"; had developed the "ability to maintain self-control"; and "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison."

The Governor, in reversing the Board's decision, **[*13]** made the following findings: **Singler** committed an "atrocious crime ... with a level of premeditation," while his "two small children slept nearby." His "actions [were] more than the minimum necessary to sustain a conviction for second degree murder," and "[t]his factor alone" demonstrated that **Singler** "would pose an unreasonable public safety risk." Furthermore, his risk to public safely was shown by the fact that he dumped his wife's body in a rural area, "defiling her in the process," which "was akin to dumping garbage in the wild to be ravaged by animals."

Another parole hearing was conducted in June 2006, which is the subject of the present petition for writ of habeas corpus. The "Life Prisoner Evaluation Report" prepared for the hearing stated **Singler** has "exceptional work habits" and employable skills, and has maintained an "exemplary disciplinary history." The report noted among other things that **Singler's** crime was committed "during a time of duress"; **Singler** was remorseful and ashamed of "the unhappiness he caused [his wife's] family, his children, and his [other] family members; he received "laudatory chronos" for his participation in "therapy, self-help and educational **[*14]** activities"; and he had "a complete and well thought out parole plan with an excellent source of support through the Veteran's Administration along with the support of his family and friends." The report concluded: "Considering the prolonged circumstances that [led] up to the commitment offense, the absence of a prior criminal record, his prison adjustment, and psychiatric reports, ... **Singler** will re-integrate back into society without incident."

An evaluation prepared in April 2005 by a clinical psychologist at San Quentin Prison observed that the then 60-year-old **Singler** had accepted full responsibility for the crime and expressed a level of remorse that reflected "a genuine understanding of the harm [he caused] and a sincere regret for

having committed the crime." Noting that "loss of impulse control" was a causative factor for the murder, the psychologist pointed out that a "person can change 'over time.'" The evaluation summarized **Singler's** experiences in many programs during his incarceration, **Singler's** belief he had "learned to walk away from situations that are 'not fixable,'" and his comment, "You can control what you do next, you can let it go, you don't have to act on [*15] it." The psychologist opined that **Singler** posed a "low substantial risk for dangerousness if released to the outside community," given his lengthy period of disciplinary free behavior in prison, his "prosocial" activities, the absence of violent behavior since his arrest, his higher level of emotional maturity, the support of his children, his acceptance into a transitional program that will provide continued supervision in a structured setting, his good prospects for a job in a marketable field from the Plumbers Union, and his continued support from the Buddhist community.

At the parole hearing, **Singler** testified as follows: He and Gayle had been having marital difficulties for months. Sometimes their fights became "pretty bad." Gayle would shove him, and he would slap her on the arm or on the face. They separated after their daughter was born, at which time their debts were "through the roof." He sold some real property and was able to "put [their] finances back to zero." He and Gayle reunited, began seeing a marriage counselor, and had their second child. **Singler** purchased another property on which to build a home, but Gayle "kept wanting to spend," [*16] which led to trouble with finances.

Around that time, Gayle became friends with Debbie G., with whom Gayle associated "a lot"; Gayle would be "[g]one all day, gone all night." **Singler** had been working extra hours trying to get the home built, and he would often come home to discover that Gayle was not there, and had not taken care of the house or made dinner. Her relationship with Debbie G. caused stress in the marriage.

On the day of the murder, **Singler** went to the bank to "roll over" the $10,000 that he had saved for home construction, but the teller advised him the account was empty. **Singler** became very angry because things "had been escalating over months and months." During a heated argument with Gayle that evening, she said she was having an affair, was divorcing him, and was taking the children. **Singler** went to the garage to get a shotgun with which to scare his wife, but he then loaded the gun, returned, and fatally shot her in a fit of rage.

**Singler** was in shock, but realized that he needed to remove his children from the situation; so he drove them to a friend's house, taking care to leave the house via a path that would prevent them from viewing their mother's body. He then [*17] returned home, put Gayle's body in the truck, drove to a rural road turnout, and dumped her body.

The Board asked **Singler** at what point he decided to kill Gayle. **Singler** replied that he did not remember the exact point because he was in a "fit of rage." He explained that he "didn't have any coping skills at that time," and the "heartbreak" of the loss of all his plans for the future "just completely blew [him] away, [he] just couldn't handle it." He was in a rage and decided he "had to end it all right there on that spot." According to **Singler,** he and Gayle "had talked all we were going to talk. There was no more, nothing else to discuss. She had already made her statement ... what she was going to do. And ... the pure burst of heartbreak, it just ate me up. I just completely blew it."

When asked why he dumped her body "like trash," rather than dealing with it in "another manner that would be appropriate," **Singler** stated he was in shock and was not thinking rationally. It was not his intention for the animals to dispose of the body as the Board suggested. He simply was trying to get away with the crime and "keep [his] children intact."

**Singler** explained that the crime occurred because [*18] of his anger and, as a result of that, he had "been studying anger since day one." He had studied it extensively, through anger management classes and Buddhist teachings, and learned that anger stems from irritations that are allowed to build. He learned that the catalysts for anger may never change, but that a person can change how he reacts. **Singler** has learned not to act on his anger. Through Buddhism, he has learned to meditate and to let things go when situations arise that anger him.

**Singler** expressed remorse for murdering Gayle and, based on his own experience in losing a child during his first marriage, he stated he understood the pain he had caused others. The child's death when he was 36 hours old, and the resulting grief and stress, caused the demise of the marriage. According to **Singler,** he could only imagine the pain caused by losing a loved one to a violent crime.

**Singler** explained that if the Board paroled him, he had the total support of his friends and family, and that his children wanted him to be part of their lives. He had served in the National Guard from 1965 until his honorable discharge in 1971; thus, he had been accepted into three different programs sponsored [*19] by the Veterans Administration if he were paroled. Those programs involved placement in transitional housing, the provision of clothing and job opportunities, and access to counselors.

Prior to his incarceration, **Singler** worked as a journeyman plumber for several years. He planned to continue working in the plumbing trade and had the support of the Plumber's Union. He wanted to return to the workforce while he was still able to do so.

The Board found that **Singler** was not suitable for parole even though he had participated in a "plethora of positive activities," his work performance was exceptional, he continued to participate in self-help programs, and he had a lengthy and continuous history of exemplary behavior. As explained by members of the Board, it had concerns about "at what point you [**Singler**] decided you weren't going to scare your wife you were going to kill her," "how that breakdown happened," and "whether or not the tools are in place that prevent you from going there again." The "conscious loading [of] the gun and making the decision to go in and shoot her," led a Board member to "feel that you [**Singler**] are young enough to go out there and develop a new relationship," thus [*20] a need existed to "identif[y]" the "trigger point ... so it never happens again." In this regard, a Board member emphasized that **Singler** decided to shoot his wife despite the fact their two children were in the house and "could have walked into that room." The circumstances of **Singler's** "disposal of [the] body," also "raised some concerns ... related to [his] insight." Hence, a Board member remarked that, in addition to the circumstances of the shooting, the "blatant disregard of [the victim's] remains" demonstrated "a massive system failure" as to the "human condition" that "prevent[s] people from doing this kind of thing." The Board member went on to say that **Singler** had failed to convince the panel that the potential for such a "system failure" to occur again is "not still a part of your being ... ."

DISCUSSION

I

One year prior to the minimum eligible parole release date of an inmate sentenced to indeterminate prison term, the Board must "normally set a parole release date ... in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council [*21] may issue and any sentencing information relevant to the setting of parole release dates." (Pen. Code, § 3041, subd. (a).) The Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).)

The Board is required to "establish criteria for the setting of parole release dates." (Pen. Code, § 3041, subd. (a).) A panel of the Board must determine whether the life prisoner is suitable for release on parole, and "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a); further section references are to title 15 of the California Code of Regulations unless otherwise specified.) "A parole date shall be denied if the prisoner is found unsuitable [*22] for parole under Section 2402(c)," but "[a] parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." (§ 2401.)

The regulations set forth six factors tending to demonstrate unsuitability for release on parole, including the inmate's (1) commission of the offense in an especially heinous, atrocious, or cruel manner, (2) previous history of violence, (3) unstable social history, (4) prior sadistic sexual offenses, (5) lengthy history of mental problems, and (6) serious misconduct in prison or jail. (§ 2402, subd. (c).)

The regulations also set forth nine factors tending to show suitability for release on parole, including (1) the absence of a juvenile record, (2) a history of reasonably stable social relationships with others, (3) tangible signs of remorse, (4) the commission of the crime resulted from significant stress, especially if the stress had built over a long period of time, (5) battered woman syndrome, (6) a lack of a history of violent crime, (7) increased age, which **[*23]** reduces the probability of recidivism, (8) marketable skills and reasonable plans for the future, and (9) responsible institutional behavior. (§ 2402, subd. (d).)

The importance of those factors is left to the discretion of the parole panel (§ 2402, subds. (c), (d)), and judicial review of the Board's parole decisions is very limited. This is so because parole release decisions "entail the Board's attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (In re Rosenkrantz, supra, 29 Cal.4th at p. 655 (hereafter Rosenkrantz). Such a prediction requires analysis of individualized factors on a case-by-case basis and, in this regard, the Board's discretion is """almost unlimited.""" (Ibid.)

Thus, "the court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (Rosenkrantz, supra, 29 Cal.4th at p. 658, italics added.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board] ... **[*24]** [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (Id. at p. 677.)

"The factor statutorily required to be considered, and the overarching consideration, is 'public safety.'" (In re Scott, supra, 133 Cal.App.4th at p. 591 (hereafter Scott).) Therefore, "the determination of suitability for parole involves a paramount assessment of the public safety risk posed by the particular offender." (In re Dannenberg (2005) 34 Cal.4th 1061, 1084 [23 Cal. Rptr. 3d 417, 104 P.3d 783] (hereafter Dannenberg); see also Pen. Code, § 3041, subd. (b); **[*25]** §§ 2401, 2402, subd. (a).) As previously noted, the decision to deny parole cannot be arbitrary or capricious. (Rosenkrantz, supra, 29 Cal.4th at p. 677.)

Accordingly, the relevant test is not whether some evidence supports the reasons cited for denying parole, "but whether some evidence indicates [an inmate's] release unreasonably endangers public safety." (In re Lee, supra, 143 Cal.App.4th at p. 1408, fn. & italics omitted (hereafter Lee); 2 see also In re Tripp (2007) 150 Cal.App.4th 306, 313 [58 Cal. Rptr. 3d 64] ["evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public"].)

### FOOTNOTES

2 It is to this statement in Lee that the California Supreme Court specifically directed us in its order granting review and transferring the matter to us.

"Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (Lee, supra, 143 Cal.App.4th at p. 1409.) "For example, a seriously troubled adolescence, even for an 80-year-old inmate, might constitute 'some evidence' of 'a history of unstable or tumultuous relationships with others.' ([] § 2402, subd. (c)(3).) **[*26]** It would not necessarily be some evidence of an unreasonable danger to public safety." (Id. at p. 1409, fn. 4.)

II

The Board does not dispute that all of the suitability factors are favorable to **Singler**. He has no juvenile or adult record. Other than his conflict with his wife, he has a stable social history. He has

shown genuine remorse over his killing of his wife. He is over the age of 60, which means that he is of an age which reduces the probability of recidivism. He has made realistic plans for release. He has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. And there is significant evidence that he committed the crime as a result of significant stress in his life. (§ 2402, subd. (d).)

This, the Board argues, does not mean **Singler** is entitled to parole. Asserting it need demonstrate only that a modicum of evidence supports any of the unsuitability factors, the Board argues the denial of parole is supported by evidence of **Singler's** lack of "insight" into what triggered the murder of his wife—specifically "why he 'snapped' and decided to kill [her] rather than simply scare her." According to the Board, **Singler's** inability [*27] to explain this supports its finding that he posed a risk of reacting in a similar way if confronted on parole with an "'acute loss of significant relationships or feelings of sudden betrayal in [a] relationship in which he is emotionally invested.'"

The problem with this position is its premise that **Singler** was unable to explain why he turned from intending only to scare Gayle to deciding to kill her. Actually, **Singler** did explain. According to him, after months of marital difficulty due to Gayle's compulsive spending, he learned from Gayle that she was having an affair with another person, that she wanted to divorce him and take their children, that she had emptied their bank account, and that she threatened to leave him destitute. All of this, he said, caused him to be overcome by rage. He "just completely blew it" because of the heartbreak and loss of his dreams for the future.

**Singler** went on to explain that he recognized his response was unacceptable and that through therapy and numerous anger management and self-help programs and efforts, including his embracing Buddhism, he had learned appropriate methods to control angry impulses. In his words, because he recognized that he [*28] killed his wife in rage, he has "been studying anger since day one" in prison and has learned that the catalysts for anger may never change, but that he can change how he chooses to react.

All of the other evidence disclosed that **Singler's** efforts to learn anger and impulse control have been successful. Except for the destruction of a blanket when he was first incarcerated in 1983, **Singler** has been a model prisoner even though life in prison had presented a myriad of opportunities to "snap" from stress.

The psychological evaluations consistently described **Singler** as (1) having acted uncharacteristically on the night of the murder due to a "loss of impulse control" after being "taxed beyond his coping ability"; (2) having accepted responsibility promptly; (3) having embraced self-help courses; and (4) having achieved emotional stability.

As far back as 1986, a psychological evaluation described **Singler's** offense as "an isolated episode provoked by a marital conflict" and the "result of an explosive release of frustration and anger which had been building[] up[,] over a period of several months."

An evaluation prepared in 1999 stated: "Given Mr. **Singler's** somewhat conservative working class [*29] background and his difficulty in coming to terms with his wife's relationship with another woman, ... he overreacted and emotionally lost control."

An evaluation in 1989 opined that **Singler** has learned from his experience, accepts responsibility for it, and "would tend to approach even more serious situations in a very calm, rational manner."

A different therapist echoed this opinion in 1994, opining that **Singler's** maturation and experience in state prison "would induce him to deal with volatile serious situations in an even more rational controlled fashion."

The psychotherapist who evaluated **Singler** in 1990, observed that he "continue[d] to program in an outstanding and exceptional manner," and "[i]n a less-controlled setting, such as return to the community, he is likely to hold present gains and continue improvement."

A psychologist's report from 1995, which addressed whether **Singler** needed therapy, stated that limited clinical services would be more wisely utilized on other prisoners, and "**Singler** is indeed unusual for a prison population, being free from the customary concerns with regard to public safety,

emotional stability and personal responsibility."

An evaluation in 1999 described [*30] **Singler** as having been an "active participant in a range of self-help groups and community based service type projects" and, thus, "he has gained significantly in emotional understanding and insights regarding himself."

Similarly, a 2002 evaluation described **Singler** as having taken steps to decrease his risk factors for future violent behavior.

And the most recent evaluation in 2006 stated that **Singler** had gained a higher level of maturity after participating in religious, educational, and occupational activities while in prison and that he had a low risk for violence outside of a controlled setting.

In sum, there is no evidence that **Singler** lacks insight into why he killed his wife. To the contrary, the evidence disclosed that for many years, **Singler** has understood the reasons why he killed his wife, has recognized that he significantly overreacted to his angry impulses in doing so, and has learned to harness in socially acceptable ways the anger arising from life's inevitable frustrations.

III

We [*31] now turn to the question whether some evidence supports the Board's finding that the circumstances of the murder and disposal of the body demonstrate that **Singler** remains a danger to the public.

As we have already noted, "the nature of the ... offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz, supra*, 29 Cal.4th at p. 682.) An inmate may be unsuitable for parole if he "committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subd. (c)(1).)

Thus, under the regulations, for **Singler's** second degree murder of his wife to make him unsuitable for parole, it must have been committed in an "especially [*32] heinous, atrocious or cruel manner," which is not measured by "general notions of common decency or social norms, for by that yardstick all murders are atrocious. [Citation.]" (*Lee, supra*, 143 Cal.App.4th at p. 1410.) This is so because malice is a necessary element of **Singler's** crime, and by definition it involves an extreme indifference to the value of human life, an element of viciousness, some callousness, and a degree of emotional insensitivity to the feelings and suffering of others. (*Ibid.*) Hence, "an unsuitability determination must be predicated on 'some evidence that the particular circumstances of [the] crime—circumstances beyond the minimum elements of his conviction—indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.'" (*In re Weider* (2006) 145 Cal.App.4th 570, 588 [52 Cal. Rptr. 3d 147], quoting *Dannenberg, supra*, 34 Cal.4th at p. 1098.) Otherwise, "denial of parole based upon the nature of the offense alone might rise to the level of a due process violation ... [and] would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses [*33] of similar gravity and magnitude in respect to their threat to the public. ...' [Citation.] 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted ... [and] destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' [Citation.]" (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) [3]

**FOOTNOTES**

3 The paragraph above is taken from the page in *Rosenkrantz* that the Supreme Court cited in its order granting review and transferring the matter to us.

*Rosenkrantz* emphasized, however, that the Board has ""'great" ... and "almost unlimited""" discretion in assessing "the importance attached" to the circumstances of an inmate's [*34] crime in the Board's "attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts"; thus, judicial review of the denial of parole is "extremely deferential" to the Board's decision, i.e., a court does not independently assess the merits of the Board's analysis, "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole," and a court can overturn the Board's decision only if it was "arbitrary and capricious." (*Rosenkrantz, supra*, 29 Cal.4th at pp. 626, 654, 655, 657, 665, 677, 679.)

Strictly construing this directive of *Rosenkrantz*, we initially denied **Singler's** petition for writ of habeas corpus because, giving great deference to the Board's finding, we could not say it acted arbitrarily and capriciously in concluding that in reacting to the heated argument with his wife by getting a shotgun, loading it, and shooting her, and then dumping her body on the side of a rural road, **Singler** acted in a particularly "egregious" way—beyond that which was necessary for a conviction—because the [*35] shooting occurred in the family home while their two small children were present and, as one of the Board members observed, "[e]ither child could have walked into that room" (*Rosenkrantz, supra*, 29 Cal.4th at p. 683), and (2) the crime was therefore sufficiently heinous to demonstrate that **Singler** would remain a danger to the public if released on parole.

It appears, however, that in granting review and transferring the matter back to us for reconsideration in light of additional authorities, the California Supreme Court believes we construed the standard of review articulated in *Rosenkrantz* too narrowly and were too deferential to the Board's finding. We reach this conclusion because of the specific citations to authority included in the Supreme Court's order, i.e., authorities interpreting *Rosenkrantz* in a manner that appears to give courts greater leeway in reviewing the Board's finding that an inmate remains a danger to public safety.

Pages 594-595 of *Scott, supra*, 133 Cal.App.4th 573, which were specifically cited by the Supreme Court, held the fact an inmate may be deemed unsuitable for parole based solely upon the nature of the offense "must be properly understood" as follows: [*36] "The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor '*without regard to or consideration of subsequent circumstances*' may be unfair [citation], and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. *Yet, the predictive value of the commitment offense may be very questionable after a long period of time.* [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense *warrants especially close scrutiny*." (*Id.* at pp. 594-595, fns. omitted; italics added.)

Pages 496-498 of *In re Elkins, supra*, 144 Cal.App.4th 475 (hereafter *Elkins*), which were specifically cited by the Supreme Court, quoted and applied the holding of *Scott* stated above, and emphasized language of a footnote on page 595 of *Scott, supra*, 133 Cal.App.4th 573, [*37] which says that "a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable." (*Id.* at p. 595, fn. 9) Therefore, *Elkins* reiterated, whether the nature of the offense justifies the denial of parole must be viewed in light of "subsequent circumstances," namely the rehabilitative efforts made by the inmate while in prison. (*Elkins, supra*, 144 Cal.App.4th at pp. 498-499.)

Page 1408 of *Lee, supra*, 143 Cal.App.4th 1400, which was specifically cited by the Supreme Court, also quoted and applied the holding of *Scott* stated above, emphasizing that some evidence of the existence of a particular factor—i.e., the nature of the inmate's offense—"does not necessarily equate to some evidence the [inmate's] release [on parole] unreasonably endangers public safety." (*Lee, supra*, 143 Cal.App.4th at p. 1409, fn. omitted.)

The Board contends that *Scott, Elkins,* and *Lee* were wrongly decided. (See *In re Jacobson* (2007) 154 Cal.App.4th 849, 853 [65 Cal. Rptr. 3d 222], review granted Dec. 12, 2007, B195521 ["We disagree with the recent decisions of some courts of appeal [citations, **[*38]** including *Scott, Elkins,* and *Lee*], which have transmuted the *Rosenkrantz* standard into one that permits the court to reweigh evidence, recalibrate relevant factors, and reach an independent determination whether the inmate continues to pose a risk to public safety"].)

However, when it granted review in this case and transferred the matter back to us, the California Supreme Court cited *Scott, Elkins,* and *Lee* with approval, thus indicating the Supreme Court's view that those decisions do not conflict with *Rosenkrantz*.

Consequently, we obediently reassess this matter, applying the judicial gloss that *Scott, Elkins,* and *Lee* placed on the standard of review articulated in *Rosenkrantz*. As we now understand the test apparently embraced by the California Supreme Court, a court may overturn the Board's denial of parole based solely on the nature of the commitment offense if (1) a significant period of time has passed since the crime, (2) there is uncontroverted evidence of the inmate's rehabilitation, and (3) the crime was not committed in such an especially heinous, atrocious, or cruel manner so as to undermine the evidence that the inmate's rehabilitative efforts demonstrate he no longer would **[*39]** be a danger to society if released on parole.

Such is the case here.

As recounted in detail in our summary of the facts, *ante,* there was overwhelming, uncontroverted evidence that **Singler** immediately expressed genuine remorse for murdering his wife, and that during his 23 years of incarceration, **Singler** had learned through therapy, anger management classes, and other self-help programs how to deal in socially acceptable ways with anger that may arise from life's inevitable frustrations, such that in the view of mental health experts, he posed a low risk of danger to the public if released on parole.

The fact that **Singler** disposed of Gayle's body in a rural area did not make the crime so "especially heinous, atrocious or cruel" (§ 2402, subd. (c)(1)(C)) as to undermine the evidence that his rehabilitative efforts demonstrated he no longer would be a danger to public safety if released on parole. His disposal of the body was not equivalent to abusing, defiling, or mutilating it during or after the offense. He says he simply attempted to evade detection by hiding the body. He revealed the location of the body the following day, and there is no evidence supporting a Board member's concern **[*40]** that wild animals could have ravaged the body in the interim. (*Elkins, supra,* 144 Cal.App.4th at p. 498 [given the lapse of 26 years and the rehabilitative gains made by Elkins, the continued reliance on the fact that he dumped the body down a steep grade at Donner Pass did not amount to "some evidence" supporting the denial of parole].)

And the fact that **Singler** shot his wife as their children slept in the next room does not demonstrate the crime was so especially heinous, atrocious, or cruel that, despite **Singler's** rehabilitative efforts, he remains a danger to the public nearly a quarter of a century later. He did not attack, injure, or kill multiple victims; he did not carry out the offense in a dispassionate and calculated manner, such as an execution-style murder; the shooting did not demonstrate an *exceptionally callous* disregard for human suffering; and the motive for the crime was not inexplicable or very trivial. (§ 2402, subd. (c)(1).) Rather, all the psychological evaluations and uncontradicted evidence disclosed that **Singler,** as he claims, committed the offense while experiencing an unusual amount of stress over a long period of time, which is a factor indicating suitability **[*41]** for parole. (§ 2402, subd. (d)(4).) He became enraged upon learning that his wife was having an affair and that she planned to divorce him, take their children, and leave him destitute. This was an unacceptable reason to kill another human being— as are virtually all motives except for defense of self or others. However, viewed in context, it was not trivial, inexplicable, or dispassionate; and it did not reflect an exceptionally callous disregard for human suffering so as to undermine the uncontested evidence that his rehabilitative efforts showed he no longer would be a danger to public safety if released on parole. (See, e.g., *In re Roderick* (2007) 154 Cal.App.4th 242, 264-266 [65 Cal. Rptr. 3d 16]; *Lee, supra,* 143 Cal.App.4th at pp. 1404, 1412.)

In sum, uncontested evidence established that **Singler** met every suitability factor listed in the regulations; his psychological evaluations were uniformly supportive; his Life Prisoner Evaluation Report was completely favorable and opined that he will reintegrate into society without incident; and his children, who were victimized by the murder, desired his release. Against this backdrop, **Singler's**

crime, which occurred over two decades ago, was not so "especially **[*42]** heinous, atrocious or cruel" (§ 2402, subd. (c)(1)(C)) to undermine the evidence that his rehabilitative efforts demonstrate he no longer would be a danger to public safety if released on parole. Therefore, the Board's decision to deny parole must be overturned, as indicated by the California Supreme Court in its order directing us to issue an order to show cause why the Board "did not abuse its discretion and violate due process in finding petitioner unsuitable for parole in June 2006, and why petitioner remains a danger to public safety. (See Pen. Code, § 3041; *In re Rosenkrantz*[,*supra,*] 29 Cal.4th [at p.] 683; *In re Elkins* [,*supra,*] 144 Cal.App.4th [at pp.] 496-498; *In re Lee*[,*supra,*] 143 Cal.App.4th [at p.] 1408; *In re Scott*[,*supra,*] 133 Cal.App.4th [at pp.] 594-595.)" (Order granting petn. review, Apr. 25, 2007.)

DISPOSITION

The petition for writ of habeas corpus is granted because the evidence presented at the 2006 parole hearing does not support the Board's finding that **Singler** was unsuitable for parole at that time. The Board is directed to release **Singler** on parole unless, within 30 days of finality of this decision, the Board holds a hearing and determines that *new evidence* **[*43]** of *Singler's conduct in prison subsequent to the 2006 parole hearing* supports a determination that parole should be rescinded because he currently would present a danger to public safety if he is released on parole. (See § 2450 et seq.; *Rosenkrantz, supra*, 29 Cal.4th at p. 626.)

Nicholson and Raye, JJ., concurred.

Source: Legal > / . . . / > CA State Cases, Combined
Terms: **singler and date geq (02/28/2008)** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Friday, March 28, 2008 - 7:58 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
▣ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

LexisNexis®   About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



## PROOF OF SERVICE BY MAIL

(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                     ) SS.
COUNTY OF MONTEREY )

I, __HAROLD D, DYSON_____, am a resident of the State of California, County of Monterey. I am over the age of 18 years and I am/~~not~~ a party to the within action.

My business/residence address is P.O. Box 689, Soledad, California, 93960-0689.

On __MAY 3rd_____, 20 __08__, I served the foregoing: "MOTION FOR JUDICAL NOTICE"

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the United States mail at Soledad, California, addressed as follows:

    OFFICE OF THE CLERK
    UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT
    450 GOLDEN GATE AVE
    SAN FRANCISCO, CALIF. 94102

There is regular delivery service by the U.S. Postal Service between the place of mailing and the places so addressed.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this __3rd__ day of __MAY_____, 20 __08__, at Soledad, California.

/S/ __HAROLD D, DYSON_____

    *Harold D. Dyson* (signature)



FROM:
MR. HAROLD D. DYSON
C-80683 Z-341-L
C.S.P. SOLEDAD
P.O. BOX 689
SOLEDAD, CALIF.
93960-0689

TO:
"OFFICE OF THE CLERK"
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT
450 GOLDEN GATE AVE
SAN FRANCISCO, CALIF.
94102



UNITED STATES POSTAGE
$01.14°
MAILED FROM ZIPCODE 93960
MAY 02 2008